

# Fourth Court of Appeals
## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-11-00845-CR

Diego **IBARRA**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 437th Judicial District Court, Bexar County, Texas
Trial Court No. 2008CR7150A
Honorable Lori I. Valenzuela, Judge Presiding

Opinion by:    Rebeca C. Martinez, Justice

Sitting:       Catherine Stone, Chief Justice
               Sandee Bryan Marion, Justice
               Rebeca C. Martinez, Justice

Delivered and Filed:  April 17, 2013

AFFIRMED

Diego Ibarra appeals his conviction for murder, arguing that the trial court erroneously admitted extraneous offense evidence in violation of Texas Rules of Evidence 404(b) and 403. We affirm the judgment of the trial court.

### BACKGROUND

*The State's Case*

On the night of May 27, 2008, Eduardo Lopez was inside his house at 313 Aransas Avenue when Ibarra came to his door to ask him for bullets. Lopez kept a 9 millimeter gun

locked up under his house and ammunition hidden in the backyard. Lopez gave Ibarra four or five 9 millimeter bullets. Ibarra introduced Lopez to another man, whom he identified as his cousin. While the three men were standing in front of Lopez's house, a maroon convertible Mustang seating three African Americans—two men and a woman—drove by. At the same time, Lopez heard a shot fired from behind him. The only person holding a gun was Ibarra. Lopez told Ibarra and his cousin to leave, and they left in a green Mustang. Lopez did not see who was driving when the pair left, but testified that Ibarra was driving the green Mustang when they arrived at Lopez's house. Within minutes of Ibarra leaving, Lopez heard six or seven gunshots in the vicinity. Shortly thereafter, Lopez heard a crash; he next saw the green Mustang across the street, with white paint transfer down its side and the mirror hanging down.

The driver of the maroon convertible Mustang was Simona McCalister. Simona testified that the car belonged to her brother, John, who was sitting in the passenger seat. Their friend, Earl Freeland, was sitting in the backseat. Simona was driving up Aransas Avenue when she heard a gunshot. The shot came from the direction of a house where there appeared to be a party underway, and there were a number of people in the front yard. As Simona drove by the house and heard the shot, she saw Ibarra standing with his head down and a pistol in his hand. She saw another man run up to Ibarra and say, "No, no." Simona stated that Ibarra was "looking at us like he . . . hated us or something."

Simona wanted to alert the police, but first drove Earl by his aunt's or grandmother's house on Cuney Way so that he could hide some drugs he was carrying. On the way back, Simona drove down Pine Street until she reached Aransas Avenue where she heard a whistle. She drove a block further up the street and stopped at the intersection of Denver and Pine Street. Within seconds, she saw a green Mustang speeding towards her. Earl initially raised up out of the backseat to acknowledge the other car, thinking that he recognized the car as belonging to

someone he knew. When Earl saw a gun, however, he slid back down and yelled, "Duck, duck!" The green Mustang pulled up alongside Simona, so that the drivers were side by side but facing opposite directions. Simona saw the driver of the green Mustang, with his left hand on the steering wheel, reach down in his lap and pull out a gun that he began shooting with his right hand. She slid down in her seat and tried to drive off. She heard between eight and ten shots fired. Simona heard Earl screaming that he had been shot. She did not hear her brother, John, say anything, and when she turned to look at him he was bleeding from "front to back." John McCalister died as a result of a gunshot wound to his head.

Simona sped away and stopped when a police car appeared behind her with its emergency lights flashing. Simona tried to tell the officer that John and Earl had been shot, but due to the confusion surrounding the two Mustangs, she and Earl were initially placed in handcuffs. She was questioned and placed in the back of a police car, then driven to the house where she had heard the first gunshot. After giving a statement at police headquarters, Simona was taken to University Hospital to identify the shooter. The man she was asked to identify appeared drugged or intoxicated and his face was swollen and eyes shut; her identification of Ibarra was thus tentative because earlier in the night he did not look like he was on drugs, but that he "was just out to get somebody." After viewing photographs of Ibarra, Simona thought Ibarra more closely resembled the person who she had seen shooting at her. Simona then returned to the police station and made a positive identification of the second suspect, who was later identified to her as Jordan Medina.

Earl similarly testified that the green Mustang pulled up alongside the car he was riding in with the McCalisters. Earl recalled the shooter looking him in the eye before pulling out the gun; the shooter acted "like we had problems, . . . [l]ike we had [a] beef or something." Earl was

shot twice in the back and taken to the hospital. At the hospital, Earl identified Ibarra as the driver of the green Mustang and the shooter.

*Appellant's Defense*

Ibarra testified in support of his defense of duress. Ibarra did not deny shooting at the maroon Mustang or that his shots resulted in the death of John McCalister and injuries to Earl. Ibarra explained, however, that an individual by the name of "Chino" forced him to shoot. Ibarra claimed that he and Chino were in front of Lopez's home on Aransas Avenue when the maroon Mustang drove by, with its occupants throwing gang signs. Chino fired the shot that Simona recalled first hearing. Immediately afterward, Chino ordered Ibarra to get into the green Mustang, pointing a gun at him all the while. Fearing for his life, Ibarra followed Chino's orders and drove off following the maroon Mustang. Chino sat in the front passenger seat and Jordan Medina sat in the back, along with another unnamed passenger. As Ibarra approached the intersection of Denver and South Pine Street, he saw the maroon Mustang on his left. As his car and the maroon Mustang reached a point where they were side by side, Chino tried to aim his gun to the left but could not, so he told Ibarra to shoot. Ibarra felt Chino press a gun against his ribs. Ibarra knew that if he did not shoot at the maroon Mustang, Chino would shoot him. Ibarra stopped shooting when he no longer felt Chino's gun against his ribs. Chino became upset when Ibarra stopped shooting, and aimed the gun at him. Ibarra covered his head with his hands, and Chino shot Ibarra's right hand. Ibarra then blacked out, and Chino ran off. Chino and the unnamed passenger were never apprehended by police in connection with the incident.

*State's Proffer of Extraneous Offense and the Trial Court's Ruling and Limiting Instruction*

The State argued that Ibarra's claim of duress during his direct testimony opened the door to the introduction of extraneous offense evidence related to an aggravated robbery Ibarra was accused of committing less than an hour before the murder. The trial court had previously

severed the aggravated robbery and murder charges, and had refused to allow the State to mention the extraneous offense. After Ibarra testified, the trial court changed course, stating, "Because now Mr. Ibarra has indicated that he did this under duress. And in saying that, that suggests that this was a one[-]time incident that he would not have done but for the actions of Felix a/k/a Chino. And I think the State gets the opportunity to rebut that fact." Prior to the State's cross-examination of Ibarra regarding the aggravated robbery, the trial court orally gave the jury the following limiting instruction:[1]

> You are instructed that if there is any testimony before you in this case regarding the defendant's having committed offenses, other than the offense alleged against him in the indictment in this case, you cannot consider said testimony for any purpose unless you find and believe beyond a reasonable doubt that the defendant committed such other offenses, if any were committed. And even then you may only consider the same to rebut a defensive theory in passing on the credibility of the defendant as a witness on his own behalf and the weight to be given to his testimony. And in determining whether there is motive or intent on the part of the defendant, if any, in connection with the offense alleged against him in the indictment in this case and for no other purpose.

### Evidence of Extraneous Aggravated Robbery

On cross-examination, Ibarra testified that about 45 minutes to an hour before the shooting that resulted in McCalister's death, he and Jordan Medina robbed a woman at gunpoint. Ibarra was driving his girlfriend's green Mustang, and Medina was sitting in the passenger seat. Ibarra pulled up alongside another car at a stop sign. Medina approached the car, carrying Ibarra's 9 millimeter gun, and demanded money. Ibarra claimed he did not know that Medina planned to rob the occupants of the car, further stating, "But when I seen him do it, and he came back to the car, he said they didn't have anything. So I said, Well, just get - - get whatever they got. Get whatever they got. And then they gave him - - they gave him - - I don't know who was in the car. They gave him some - - some earrings, I think."

---

[1] A similar limiting instruction was given in the court's charge to the jury.

After the defense rested, the State called Latoya Anderson as a rebuttal witness. Anderson, who is African American, testified that she was driving a silver Dodge Neon on the night of May 27, 2008 when a green Mustang pulled up alongside her. With the window rolled down, the passenger of the Mustang pointed a gun and told her to pull over. The passenger then exited the Mustang, walked to Anderson's window, pointed the gun at her, and demanded cash. Anderson, whose mother, two sisters, and young niece were also in the car, begged the man not to shoot. Anderson told him she did not have any money. The man returned to the Mustang to talk with the driver, then went back to Anderson and asked whether she had any valuable possessions. Anderson gave the man her gold earrings. The man eventually motioned for Anderson to drive off. Soon after, Anderson contacted police, and she later went to University Hospital where she positively identified Ibarra as the driver of the Mustang. At the police station, Anderson positively identified Medina as the man who held the gun.

The jury convicted Ibarra of murder, and the trial court sentenced him to sixty years' imprisonment.

## DISCUSSION

On appeal, Ibarra argues the trial court erred in admitting the extraneous offense evidence in violation of Texas Rules of Evidence 404(b) and 403. TEX. R. EVID. 404(b), 403.

### *Extraneous Offense Evidence*

Under the Texas Rules of Evidence, evidence of other crimes, wrongs, or acts is not admissible "to prove the character of a person in order to show action in conformity therewith." TEX. R. EVID. 404(b); *De La Paz v. State*, 279 S.W.3d 336, 342 (Tex. Crim. App. 2009). Such evidence may, however, "be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." TEX. R. EVID. 404(b). The exceptions listed under Rule 404(b) are neither mutually exclusive nor collectively

exhaustive. *De La Paz*, 279 S.W.3d at 343; *Poindexter v. State*, 942 S.W.2d 577, 583–84 (Tex. Crim. App. 1996). "Rule 404(b) is a rule of inclusion rather than exclusion." *De La Paz*, 279 S.W.3d at 343 (quoting *United States v. Bowie*, 232 F.3d 923, 929 (D.C. Cir. 2000)). The rule excludes only that evidence that is offered (or will be used) solely for the purpose of proving bad character and hence conduct in conformity with that bad character. *De La Paz*, 279 S.W.3d at 343 (citing *Rankin v. State*, 974 S.W.2d 707, 709 (Tex. Crim. App. 1996)). The proponent of uncharged misconduct evidence must be able to explain to the trial court, and to the opponent, the logical and legal rationales that support its admission on a basis other than "bad character" or propensity purpose. *De La Paz*, 279 S.W.3d at 343.

One well-established rationale for admitting evidence of uncharged misconduct is to rebut a defensive issue that negates one of the elements of the offense. *Id*.; *Martin v. State*, 173 S.W.3d 463, 466 (Tex. Crim. App. 2005). Accordingly, a "party may introduce evidence of other crimes, wrongs, or acts if such evidence logically serves to make more or less probable an elemental fact, an evidentiary fact that inferentially leads to an elemental fact, or defensive evidence that undermines an elemental fact." *Martin*, 173 S.W.3d at 466.

### Standard of Review

"Whether extraneous offense evidence has relevance apart from character conformity, as required by Rule 404(b), is a question for the trial court." *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003). A ruling on the balance between probative value and the counter factors set out in Rule 403 is also a question for the trial court, although "that balance is always slanted toward admission, not exclusion, of otherwise relevant evidence." *De La Paz*, 279 S.W.3d at 343; *Montgomery v. State*, 810 S.W.2d 372, 388 (Tex. Crim. App. 1990) (op. on reh'g). Thus, we review the trial court's ruling on the admissibility of extraneous offenses for an abuse of discretion. *Prible v. State*, 175 S.W.3d 724, 731 (Tex. Crim. App. 2005). We will

uphold the trial court's decision so long as its ruling is within the "zone of reasonable disagreement." *Montgomery*, 810 S.W.2d at 391. Generally, a trial court's ruling is within this zone if the evidence shows that 1) an extraneous transaction is relevant to a material, non-propensity issue, and 2) the probative value of that evidence is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury. *De La Paz*, 279 S.W.3d at 344.

*Analysis*

Ibarra contends that the evidence regarding the aggravated robbery was inadmissible under Rule 404(b) because it only served to prove a character trait and to show that Ibarra acted in conformity with that trait when he shot John McCalister. Ibarra stresses that, although both offenses involved African American victims, occurred within an hour of each other in the same neighborhood, and occurred while he was driving the green Mustang and while the car was stopped at an intersection, the offenses are more dissimilar than they are alike. Most notably, Chino was not involved in the robbery and Ibarra did not hold a gun during the robbery. Thus, he asserts that the extraneous offense evidence was not relevant to prove motive or intent or to disprove his defense of duress. We disagree.

Under the circumstances in this case, the trial court could have reasonably concluded that evidence of Ibarra's participation in the aggravated robbery had some logical relevance aside from character conformity. The fact that Ibarra admitted committing the robbery with a deadly weapon—the same 9 millimeter gun that was used in the murder of John McCalister 45 minutes later—tends to rebut his claim of duress. *See Montgomery*, 810 S.W.3d at 376 (evidence is relevant if it "provides a small nudge toward proving or disproving some fact of consequence"); *see also King v. State*, 189 S.W.3d 347, 355 (Tex. App.—Fort Worth 2006, no pet.) (evidence of extraneous offense may be probative to rebut defensive theory of duress). Thus, it was at least

subject to reasonable disagreement whether the extraneous offense evidence was admissible for the noncharacter-conformity purpose of rebutting Ibarra's defensive theory of duress. Accordingly, we cannot conclude the trial court abused its discretion in admitting the extraneous offense evidence under Rule 404(b). We therefore overrule Ibarra's first issue.

Ibarra also argues that the extraneous offense evidence should have been excluded under Rule 403 because it was more prejudicial than probative. TEX. R. EVID. 403. Even when the admission of extraneous offense evidence is permissible under Rule 404(b), we must still determine whether the probative value of the offense is substantially outweighed by the danger of unfair prejudice under Rule 403. *Id*.; *Moses*, 105 S.W.3d at 626. We consider the following factors when conducting a Rule 403 analysis: (1) the strength of the extraneous offense evidence to make a fact of consequence more or less probable; (2) the potential of the extraneous offense to impress the jury in some irrational but indelible way; (3) the time during trial that the State requires to develop evidence of the extraneous misconduct; and (4) the need by the State for the extraneous evidence. *Erazo v. State*, 144 S.W.3d 487, 489 (Tex. Crim. App. 2004); *Montgomery*, 810 S.W.2d at 389–90. We uphold the trial court's ruling on a Rule 403 balancing test if it is within the zone of reasonable disagreement. *Santellan v. State*, 939 S.W.2d 155, 169 (Tex. Crim. App. 1997). Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial. *Williams v. State*, 958 S.W.2d 186, 196 (Tex. Crim. App. 1997).

Considering the factors pertinent to the Rule 403 balancing test, we first note that the evidence in question was highly probative because it tended to rebut Ibarra's defense of duress. This factor weighs in favor of the admission of the evidence. Second, the evidence did carry the danger of impressing the jury in some irrational and indelible way; this factor therefore weighs against admission of the evidence. Third, although evidence of the aggravated robbery was

developed by the cross-examination of Ibarra and through three other rebuttal witnesses, discussion of that offense did not consume an inordinately large amount of time (one day of a six-day trial) and did not divert the jury's attention from the crucial issues in the case. Thus, this factor weighs in favor of admission. Finally, the State's need for the extraneous offense evidence was high given that the State had no other direct evidence with which to rebut Ibarra's claim of duress. *See Montgomery*, 810 S.W.2d at 390 (final factor in Rule 403 balancing involves consideration of whether the State needed the evidence in question to establish a fact of consequence and whether that fact of consequence was in dispute). This factor therefore weighs in favor of the admission of the evidence.

After weighing the required factors, we conclude the trial court could have reasonably concluded the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. *See Erazo*, 144 S.W.3d at 489 (setting forth factors); *Santellan*, 939 S.W.2d at 169 (applying abuse of discretion standard). Because the trial court's decision to admit the extraneous offense evidence under Rule 403 was within the zone of reasonable disagreement, the trial court's decision must be upheld. *See Santellan*, 939 S.W.2d at 169. Accordingly, Ibarra's second issue is overruled.

## CONCLUSION

Based on the foregoing, we overrule Ibarra's issues on appeal and affirm the judgment of the trial court.

Rebeca C. Martinez, Justice

Do not publish